UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
CIVIL NO. 19-2048(DSD/HB)

LaToya Owens,

        Plaintiff,

v.                                              **ORDER**

Northern Tier Retail LLC
d/b/a Speedway,

        Defendant.

        Lucas Kane, Esq. and Fabian May & Anderson PLLP, 1625 Medical Arts Building, 825 Nicollet Mall, Minneapolis, MN 55402, counsel for plaintiff.

        Marko J. Mrkonich, Esq., Grant D. Goerke, Esq. and Littler Mendelson P.C., 80 South 8th Street, Suite 1300, Minneapolis, MN 55402, counsel for defendant.

        This matter is before the court upon the motion for summary judgment by defendant Northern Tier Retail LLC, d/b/a Speedway. Based on a review of the file, record and proceedings herein, and for the following reasons, the court grants the motion.

**BACKGROUND**

        This employment dispute arises out of plaintiff LaToya Owens's tenure as a Speedway employee. Speedway owns and operates gas stations and convenience stores throughout Minnesota. In April 2018, Speedway hired Owens as a customer service representative (CSR) at Store #4290 in Coon Rapids. Speedway paid

Owens $11.00 per hour and scheduled her to work approximately twenty-five hours per week. Owens Dep. at 64:4-9.

Owens was supervised by store manager William Vanover. Vanover Dep. at 16:3-8. Vanover was responsible for ensuring store safety for customers and employees, monitoring sales and inventory, implementing company programs, and completing daily paperwork. Bergen Dep. at 28:13-18. Vanover also supervised store staff, including CSRs, and determined daily tasks for each CSR. Id. at 28:19-29:3, 55:7-57:18. Vanover was supervised by district manager, Dave Bergen. Id. at 19:17-20:6.

Owens received and reviewed a copy of the CSR job description when she began her employment. Id. 75:13-23. According to that description, CSRs are required "to perform repeatedly and for extended periods of time: bending, standing, reaching, climbing, twisting/turning, pushing/pulling, squatting/kneeling/stooping, walking, and grasping" and "to occasionally lift up to 50 pounds." ECF No. 31-1, at 224. CSRs serve customers in the store and perform various physical tasks, including mopping floors, emptying trash bins, shoveling snow, stocking shelves, retrieving products, managing food and beverage stations, and cleaning bathrooms. See id. at 222-24; see also Bergen Dep. at 34:17-22. CSRs may work a shift alone or together with another CST. Bergen Dep. at 35:3-

2

36:22. The amount of time spent doing each task during a particular shift varies depending on the time of day and traffic in the store. Id. at 35:4-22.

Owens agrees that the CSR description accurately depicts her daily work for Speedway. Owens Dep. at 156:4-12. Owens estimates that she spent most of her time as CSR standing behind the cash register. Id. at 156:13-18. She also changed coffee urns as many as five times per shift, changed and cleaned the roller grills as many as three times per shift, checked bathrooms every half hour, and cleaned as needed. Id. at 157:2-10, 157:20-22, 158:13-24. Owens also changed trash bags, some of which weighed more than ten pounds. Id. at 159:8-160:9.

On July 11, 2018, Owens was injured while doing computer training in the store's back office. Owens Workers' Comp. Dep. (WC Dep.) at 30:13-20. Vanover previously advised Owens that the chair in the office was broken, but she decided to sit on it anyway. Id. at 31:7-12. The chair ultimately collapsed, and Owens fell, hitting her back and shoulder on the cement floor. Id. at 31:15-23. She was able to resume her training after falling. Owens Dep. at 36:8-10. After a few minutes, Owens reassembled the chair and sat down again. See Goerke Aff. Ex. D; Owens Dep. at 36:11-13, 46:9-20. Owens told Vanover that she had

fallen, denied that she was injured, and completed her shift. Owens Dep. at 36:14-15, 103:12-104:9.

Owens worked nine shifts over the next two weeks without complaint. Id. at 36:14-37:2; ECF No. 28-3, at 141. On July 22, 2018, Owens told Vanover for the first time that she injured her shoulder and back when she fell on July 11th and that she needed to go the emergency room. ECF No. 28-3, at 141; Vanover Dep. at 97:8-98:8. She also mentioned that a friend told her that she could receive workers' compensation for her injury. Vanover Dep. at 84:11-15. Vanover advised Owens to call Speedway's medical hotline, and she did so. ECF No. 28-3, at 141. Owens then went to the hospital where she was diagnosed with a soft-tissue injury, specifically a strain of her right shoulder and acute midline low back pain without sciatica. ECF No. 28-3, at 14. The doctor did not feel her X-ray or examination warranted an MRI. Id. at 13. She was prescribed Flexeril and discharged. Id.

Owens saw her primary care physician the next day, and he determined that she had "right-side low back pain without sciatica." Id. at 16. He noted that Owens requested an MRI and "work restrictions." Id. at 18. He did not believe that an MRI was warranted and recommended that she continue working. Id. at 19. He did refer her, however, to an occupational medicine

4

consult.   Id.   Owens was "not happy" with the doctor's recommendations and told him she planned to get a second opinion. Id.

On July 25, 2018, Owens saw an occupational medicine physician's assistant, who diagnosed her with acute low back pain. Id. at 22. The physician's assistant recommended physical therapy and the following work restrictions:  no lifting, pulling, or pushing more than ten pounds; alternate between sitting and standing with no prolonged standing longer than thirty minutes; minimize bending and twisting motions; and use of a sturdy work chair.  Id. at 24. The physician's assistant was optimistic that Owens's "symptoms will likely improve with current treatment plan and that restrictions will be loosened at next visit."  Id.  Owens scheduled a follow-up appointment for August 8, 2018.  Id. at 146.

Owens reported to work the same day and gave the restrictions to Vanover.  Owens Depo. at 48:14-22.  Vanover permitted Owens to use a chair behind the counter during her shift that day.  Id. at 48:22-49:8.  Owens nevertheless stood for most the shift and only sat down for "a couple minutes" because of a "flare-up."  Id. at 49:7-13.

The next day, Vanover emailed Owens's restrictions to Bergen, human resources representative Jason Hamen, safety specialist

Michael Baker, and Speedway's claims department.   ECF No. 28-3, at 26.   Vanover explained that, in his view, the restrictions could not be reasonably accommodated given her job duties:

> There is no way that we can accommodate her restrictions since she is a CSR that requires serving customers to include changing out coffee, roller grill, bathrooms, trash, sweeping and mopping, ringing out customers, and so forth.   I need guidance on how you would like to proceed since this is sensitive in nature. I do not want her to be on the schedule if it is going to violate her restrictions and caus[e] further injuries that she is claiming to have.   Please let me know as soon as possible.   She is scheduled to work today but I need to take her off the schedule until a follow up is done and the restrictions [have] been lifted.

Id. at 27.   Hamen agreed that Owens's restrictions could not be accommodated and asked Priscilla Galvan-Marchan, the assigned Insurance Claims Administrator, to "advise on next steps."   Id. at 26.   Galvan-Marchan responded that she would notify Speedway's workers' compensation carrier so that Owens could start on "Temporary Total Disability."   Id. at 25.

Later that day, Owens came to the store to discuss matters with Vanover.   Owens surreptitiously recorded the conversation on her cell phone.   Id. at 144-45.   During the meeting, Vanover provided Owens with a return-to-work form and explained the process by which she could return to work, as directed by a health care provider.   Id.; Owens Dep. at 51:18-23.   Vanover further explained

that Owens's current restrictions made it too difficult for her to
do her duties as a CSR and that Speedway did not want her to
"aggravate her injuries." ECF No. 28-3, at 144. He also assured
her that Speedway was "looking out" for her, she would get paid
while on leave, and she was not being terminated. Id. He then
explained how to fill out the return-to-work form when she was
able to work again. See id. at 144-45. At no time did Owens
request that she be accommodated, nor did she disagree with
Vanover's statement that her restrictions conflicted with her job
requirements. See id.

    Owens alleges that Vanover told her that she could not return
to work until she was "100 percent healed." Owens Dep. at 193:19-
23. The recording does not corroborate that allegation and, indeed,
shows that Vanover repeatedly reassured her that her job was safe
and that she would receive workers' compensation benefits while
she was medically unable to work. ECF No. 28-3, at 144-45. Owens
maintains that Speedway was angry with her for taking medical
leaving and accepting workers' compensation benefits. She
understood, however, that Speedway needed to comply with her
medical restrictions and that Speedway believed those restrictions
were incompatible with her job responsibilities. Owens Dep. at
55:11-57:8.

On July 27, 2018, Vanover asked Owens to come to the store
and sign her time sheet.  When she did so, Vanover issued her a
written warning for violating Speedway policy by reusing the broken
office chair even after she fell.  ECF No. 28-3, at 29.  She was
not otherwise reprimanded for the incident.  See id.  Owens views
the warning as retribution for taking medical leave.  As
additional evidence of Speedway's alleged hostility, Owens notes
that when the regional manager heard about her injury and medical
leave, he responded negatively by saying "Bunch of bull.  Two
weeks afterwards, she has restrictions!"  ECF No. 31-1, at 74.
She also testified that Vanover told her that Bergen was "on a
rampage" due to her reported injury.  Owens Dep. at 47:11-14.

On August 8, 2018, Speedway's insurance carrier approved
Owens's workers' compensation application for temporary total
disability.  See ECF No. 28-3, at 30.  During her medical leave,
Owens received an initial payment of $542.66 and thereafter
received $271.33 per week (two-thirds of her average weekly wage).

Owens retained counsel to guide her through the workers'
compensation process.  Id. at 10.  She also requested an
independent qualified rehabilitation consultant (QRC) to replace
the assigned medical case manager.  Id.  The QRC accompanied her
to every doctor's appointment.  Owens Dep. at 73:11-16.  Her

8

attorney defended Owens at her deposition and requested medical services on her behalf.

Unfortunately, Owens's condition did not improve as quickly as expected.  On August 8, 2018, Owens was referred to the emergency department after reporting worsening of her lower back pain and other conditions.  ECF No. 28-3, at 32, 37.  The emergency physician prescribed prednisone but declined to order an MRI "due to lack of symptoms." Id. at 37.  Two days later, Owens returned to the occupational medicine clinic for a follow-up appointment. Id. at 37.  She reported "significant improvement" in her lower back but "heaviness, weakness and numbness" on her right side. Id.  She also noted that she was "unable to fully participate [in physical therapy] due to symptoms and anxiety." Id. at 38.  The physician concluded that Owens's symptoms were not indicative of "spinal cord or radicular compression, sciatica, or any specific diagnosis," and had a "significant emotional component." Id.  He also concluded that her injury posed "no apparent risk of harm with physical activity." Id.  He encouraged Owens to participate more fully in physical therapy and perhaps consult a neurologist. Id.  Owens "express[ed] fear that there was some as yet unidentified pathology affecting her." Id.

Owens continued to receive medical care through the end of 2018. Owens Dep. at 22:2-23, 106:19-23. Each visit was fully covered by workers' compensation. Id. at 59:11-19. Speedway periodically received "workability reports" from Owens's health care providers regarding her condition. See, e.g., ECF No. 28-3, at 48. Until October 2018, each report supported the work restrictions initially imposed. In the October 2018 report, however, the restriction prohibiting her from standing longer than thirty minutes was changed to prohibit her from sitting for longer than thirty minutes. Id. at 24; id. at 56. It is unclear why this change was made or whether it was a scrivener's error. Nevertheless, given the change, Marchan-Priscilla forwarded the report to Hamen and asked if Owens could return to work. ECF No. 31-1, at 77. Hamen determined that Speedway could still not accommodate her restrictions. Id.

On December 19, 2018, Dr. Loren Vorlicky conducted an independent medical exam of Owens as part of her workers' compensation case. Id. at 69-80. Dr. Vorlicky concluded that Owens had no permanent disability and could return to work immediately without restrictions. See id. Around the same time, Owens's treating physicians also reported that her condition had improved. On January 10, 2019, Dr. Zeke McKinney increased

10

Owens's lifting restriction from ten to twenty pounds and removed her prolonged sitting restriction. Id. at 66. On January 31, 2019, Dr. McKinney increased the lifting restriction to thirty pounds and permitted Owens to bend and twist from the waist frequently instead of occasionally. Id. at 81.

Based on these reports, on February 7, 2019, Speedway extended a written offer for Owens to return to work. Id. at 83-84. Speedway offered Owens a CSR position at the same store with weekly hours starting February 11, 2019, at $11.25 per hour. Id. at 83. Speedway requested that Owens respond to the offer in writing. Id. at 83-84. Speedway also notified Owens that it was discontinuing her workers' compensation benefits given her recovery.

On February 10, 2019, Owens rejected Speedway's offer: "I was under the impression SuperAmerica did not want me back[.] [W]ithout any hours[,] I was forced to find new Employment[.] I will not be accepting this offer." ECF No. 28-3, at 85. Owens had started a new part-time job as a cashier for Holiday Gas Stations on January 31, 2019. Owens Dep. at 20:22-21:9, 132:3-7, 133:10-23, 138:13-20. On February 12, 2019, Marchan-Priscilla responded:

> We acknowledge receipt of the below and understand you voluntarily are resigning your employment with [Speedway], effective February 11, 2019. If that is not correct, please immediately let us know. If we

do not hear from you by close of business February 14, 2019, your separation from the company will be processed accordingly.

ECF No. 28-3, at 85.  On February 14, 2019, Owens responded: "I never voluntarily left SuperAmerica.  I was forced to find other (New) employment due to that fact I was not offered any hours." Id. at 87.

On February 19, 2019, Dr. McKinney cleared Owens to return to work immediately without any restrictions.  Id. at 94. Notwithstanding Owens's previous communications, on February 21, 2019, Speedway again offered to return Owens to work beginning February 25, 2019.  Owens apparently did not respond.  On February 27, 2019, Speedway sent Owens a third return-to-work offer, placing her on the schedule beginning March 1, 2019.  ECF No. 28-3, at 92. Owens rejected each of Speedway's offers because of her new job with Holiday.  Owens Dep. at 69:1-20.

On January 15, 2019, Owens filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) and the Minnesota Department of Human Rights (MDHR), alleging disability discrimination.  The EEOC and the MDHR dismissed the charges. Owens then timely commenced the present action, alleging failure to accommodate in violation of the Americans with Disabilities Act (ADA), discrimination in violation of the ADA, retaliatory

discharge in violation of the Minnesota Workers' Compensation Act
(WCA), and refusal to offer continued employment in violation of
the WCA.  Speedway now moves for summary judgment.


**DISCUSSION**

The court "shall grant summary judgment if the movant shows
that there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law."  Fed. R. Civ.
P. 56(a).  A fact is material only when its resolution affects the
outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S.
242, 248 (1986).  A dispute is genuine if the evidence is such
that it could cause a reasonable jury to return a verdict for
either party. See id. at 252.

The court views all evidence and inferences in a light most
favorable to the nonmoving party.  See id. at 255.  The nonmoving
party must set forth specific facts sufficient to raise a genuine
issue for trial; that is, the nonmoving party "must do more than
simply show that there is some metaphysical doubt as to the
material facts."  Reeves v. Sanderson Plumbing Prods., Inc., 530
U.S. 133, 150 (2000); see Anderson, 477 U.S. at 249-50; Celotex v.
Catrett, 477 U.S. 317, 324 (1986).  Moreover, if a plaintiff cannot

support each essential element of her claim, the court must grant summary judgment, because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. Celotex, 477 U.S. at 322-23.

## I.   ADA Claims

Owens contends that Speedway violated the ADA in two ways. First, Owens alleges that Speedway discriminated against her because of her disability by changing the terms and conditions of her employment and later constructively discharging her.  Second, she alleges that Speedway failed to provide her with reasonable accommodations.  To establish a prima facie case under either type of claim, a plaintiff must show that (1) she was disabled; (2) she was qualified to perform the essential functions of the job, with or without reasonable accommodation; and (3) she suffered an adverse employment action due to his disability.  Huber v. Wal-Mart Stores, Inc., 486 F.3d 480, 482 (8th Cir. 2007); Burchett v. Target Corp., 340 F.3d 510, 516 (8th Cir. 2003).  Owens has failed to meet this standard.[1]

---

[1]  Each claim involves the same prima facie elements, but varying burdens of proof.  See Fenney v. Dakota, Minn. & E. R.R. Co., 327 F.3d 707, 711-12 (8th Cir. 2003).  Because Owens has failed to establish a prima facie case under the ADA, the court need not assess the remaining aspects of either claim.

14

**A.   Disability**

Owens asserts that her injury and subsequent restrictions rendered her disabled within the meaning of the ADA.  Speedway argues that she was not disabled because she was able to engage in major life activities throughout her period of disability and because her disability was temporary.

"An impairment is a disability ... if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population."  29 C.F.R. § 1630.2(j)(1)(ii).  The standard for determining whether an impairment substantially limits a major life activity is not demanding and requires a lesser degree of limitation than the standard applied before the ADA Amendments Act.  Id. § 1630.2(j)(1)(iv).  The court broadly construes the term "substantially limits" in favor of expansive coverage.  Id. § 1630.2(j)(1)(i).  Temporary injuries and resulting limitations like Owens's can constitute a disability under the ADA's widened standard.  See Gardea v. JBS USA, LLC, 915 F.3d 537, 541 (8th Cir. 2019) ("[L]ifting restrictions may qualify as a disability under the ADA Amendments Act ... which relaxed the requirements for showing a disability."); Burnell v. Tealwood Care Ctrs., Inc., No. 16-cv-3001, 2018 WL 4293150, at *8 (D. Minn. July 10, 2018) ("[T]he

ADA does not require a specified minimum duration that an impairment must last in order to be substantially limiting."); see also 29 C.F.R. § 1630.2(j)(1)(ix) ("The effects of an impairment lasting or expected to last fewer than six months can be substantially limiting within the meaning of this section."); 29 C.F.R. Pt. 1630, App. § 1630.2(j)(1)(ix) ("For example, as noted above, if an individual has a back impairment that results in a 20-pound lifting restriction that lasts for several months, he is substantially limited in the major life activity of lifting, and therefore covered under the first prong of the definition of disability."). As a result, the court will assume for purposes of this motion that Owens was disabled within the meaning of the ADA.

**B.   Qualifications**

Under the ADA, "[a]n individual is qualified if [s]he satisfies the requisite skill, experience, education, and other job-related requirements and 'can perform the essential job functions, with or without reasonable accommodation.'" Rehrs v. Iams Co., 486 F.3d 353, 356 (8th Cir. 2007) (quoting Cravens v. Blue Cross & Blue Shield of Kan. City, 214 F.3d 1011, 1016 (8th Cir. 2000)). "Essential functions of the job are fundamental job duties, and the employer's judgment in this regard is considered

highly probative." Duello v. Buchanan Cty. Bd. of Supervisors, 628 F.3d 968, 972 (8th Cir. 2010) (citation and internal quotation marks omitted). "[A] task may be an essential function even if the employee performs it for only a few minutes each week, and even if other employees are available to perform the task for the disabled employee." Minnihan v. Mediacom Commc'n Corp., 779 F.3d 803, 812 (8th Cir. 2015). An employee's "specific personal experience is of no consequence in the essential functions equation." Dropinski v. Douglas Cty., Neb., 298 F.3d 704, 709 (8th Cir. 2002). "Instead, it is the written job description, the employer's judgment, and the experience and expectations of [managers] which establish the essential functions of the job." Id.

There is no dispute that Owens had the qualifications and skill to perform the CSR position. Nor is there a dispute that she was unable to perform the essential functions of her job without reasonable accommodation.[2] The court therefore must decide whether she could perform the essential functions of her

---

[2] Owens argues that she could perform some of her job duties, such as replenishing products on the roller grill, cleaning the roller grill, and checking and cleaning the restrooms, without violating her work restrictions. Even if true, she acknowledges that her remaining job duties required accommodation.

job with reasonable accommodation.

When an employee "cannot perform the essential functions of the job without an accommodation, [s]he must only make a facial showing that a reasonable accommodation is possible." Fenney, 327 F.3d at 712 (internal quotation marks and citation omitted). A "reasonable accommodation" may include "job restructuring, part-time or modified work schedules" or "reassignment to a vacant position." 42 U.S.C. § 12111(9).

Here, the record does not support a finding that Owens could have performed the essential functions of her job with reasonable accommodation. The CRS position expressly required her "to perform repeatedly and for extended periods of time: bending, standing, reaching, climbing, twisting/turning, pushing/pulling, squatting/kneeling/stooping, walking, and grasping" and "to occasionally lift up to 50 pounds." ECF No. 31-1, at 224. Her work restrictions directly conflicted with those tasks. She was prohibited from lifting, pulling, or pushing more than ten pounds; required to alternate between sitting and standing with no prolonged standing longer than thirty minutes; required to minimize bending and twisting motions; and required to sit regularly.

18

Even if Owens could have used a chair to accomplish certain required tasks – such as working the cash register - that accommodation would not have addressed her need to lift up to fifty pounds and to routinely bend, twist, turn, squat, kneel, and stoop. As a result, any accommodation would have required Speedway to reallocate those additional tasks to her co-workers.  It is well settled that "[a]n employer need not reallocate or eliminate the essential functions of a job to accommodate a disabled employee." Dropinski, 298 F.3d at 710.  Nor is the employer required to "reassign existing workers to assist [the employee] in his essential duties."  Id.  Because Owens's restrictions were squarely at odds with her job responsibilities, she has failed to establish that she could have performed her duties with reasonable accommodation.[3]  Owens also argues that Speedway refused to engage in an interactive process to determine whether she could be reasonably accommodated.  This concept is uniquely relevant to the

---

[3]  Speedway's decision to allow Owens to work with some restrictions for one shift does not establish that Speedway could have accommodated her restrictions throughout her period of disability.  Speedway allowed Owens to work that day because it had just learned of her restrictions and needed some time to assess the situation.  The court is also unpersuaded by Owens's argument that Speedway could have been provided her with accommodations like those given to pregnant employees, e.g., more frequent breaks, more seated tasks, and no lifting over twenty pounds, because those accommodations would not have addressed most of her work restrictions.

failure-to-accommodate claim.  See Fjellestad v. Pizza Hut of Am., Inc., 188 F.3d 944, 952 (8th Cir. 1999).  An employer fails to participate in an interactive process if: the employer knew of the employee's disability; the employee requested a reasonable accommodation; the employer did not make a good faith effort to assist the employee in seeking accommodations; and the employee could have been reasonably accommodated but for the employer's lack of good faith.  See Canny v. Dr. Pepper/Seven-Up Bottling Grp., Inc., 439 F.3d 894, 902 (8th Cir. 2006).  There is a "shared responsibility between employers and employees to resolve accommodation requests." E.E.O.C. v. Convergys Customer Mgmt. Grp., Inc., 491 F.3d 790, 795 (8th Cir. 2007).

Owens's argument fails because the record does not support a finding that she requested an accommodation.  A request for accommodation need not be in writing or use "the magic words 'reasonable accommodation,'" but it "must make clear that the employee wants assistance for his or her disability." Ballard v. Rubin, 284 F.3d 957, 960-61 (8th Cir. 2002).  Even assuming Owens could have been reasonably accommodated, at no point did Owens expressly or impliedly ask Speedway for an accommodation.  She gave Vanover her restrictions without requesting any accommodation or asking to discuss whether any accommodation would be possible.

Indeed, in her recorded conversation with Vanover, Owens did not challenge his assessment that her restrictions could not be reasonably accommodated. ECF No. 28-3, at 144-45. Rather, she appears to have agreed with his assessment. See id. Nor did she thereafter request any accommodation, opting instead to accept full workers' compensation benefits during her period of disability. Given these facts, the court cannot conclude that Speedway failed to engage in an interactive process.

### C.   Adverse Employment Action

"An adverse employment action is defined as a tangible change in working conditions that produces a material employment disadvantage, including but not limited to, termination, cuts in pay or benefits, and changes that affect an employee's future career prospects, as well as circumstances amounting to a constructive discharge." Jackman v. Fifth Jud. Dist. Dep't of Corr. Servs., 728 F.3d 800, 804 (8th Cir. 2013). Owens argues that she suffered adverse consequences because her workers' compensation benefits were less than what she would have earned had she been allowed to work. She also argues that she was constructively discharged. The record supports neither contention.

Owens concedes that she received full workers' compensation benefits, but nevertheless argues that she suffered an adverse employment action because she was paid only two-thirds of her normal wage in workers' compensation benefits during her period of disability.  She cites to no case for the proposition that receiving workers' compensation benefits constitutes an adverse employment action, and the court has found none.

The record shows that she was paid the maximum allowable benefit under the workers' compensation statute for her temporary total disability: two-thirds her average weekly wage.  See ECF No. 28-7, at 18; see also Minn. Stat. § 176.101, subdiv. 1 ("For injury producing temporary total disability, the compensation is 66-2/3 percent of the weekly wage at the time of injury.").  "The goal in determining the average weekly wage is to arrive at a fair approximation of [the employee's] probable future earning power which has been impaired or destroyed because of the injury."  Stewart v. Ford Motor Co., 474 N.W.2d 162, 163 (Minn. 1991) (internal quotation marks and citations omitted)(bracket in original).  Because, unlike wages, "[w]orkers' compensation is generally excludible from a taxpayer's gross income[,]" two-thirds pay is effectively full pay.  Flores v. C.I.R., No. 14147-04S, 2005 WL 1097268, at *2 (U.S. Tax Ct.  May 10, 2005) (citing 26

U.S.C. § 104(a)(1)).  In other words, Owens received workers'
compensation benefits equivalent to what she would have received
had she been able to work.  Under these circumstances, the court
cannot conclude that Owens suffered an adverse employment action.
See Campbell v. N.Y. City Transit Auth., 93 F.Supp.3d 148, 170
(E.D.N.Y. 2015) (holding that because plaintiff was paid workers'
compensation benefits in full, "her workers' compensation claim
did not constitute adverse action as it did not result in a
material loss of benefits").

Owens also argues that she suffered an adverse employment
action because she was constructively discharged.  The court
disagrees.  "Constructive discharge occurs when an employer
deliberately renders the employee's working conditions
intolerable, thereby forcing [her] to quit."  Carpenter v. Con-
Way Cent. Express, Inc., 481 F.3d 611, 616 (8th Cir. 2007)
(quotation marks and citation omitted).  To establish constructive
discharge, a plaintiff must show that (1) a reasonable person in
her situation would find the working conditions intolerable, and
(2) the employer intended to force her to quit.  Id.  "A plaintiff
may meet the second element by showing his resignation was a
reasonably foreseeable consequence of [her employer's]
discriminatory actions."  Id. at 617.

23

According to Owens, she was constructively discharged because Speedway did not allow her to work due to her disability. As noted, Owens received full workers' compensation benefits during her period of disability after Speedway reasonably determined that it could not accommodate her work restrictions. As such, the court cannot conclude that Speedway effectively forced Owens to quit her job. Indeed, once Owens was medically cleared to work, Speedway offered her weekly hours with the same rate of pay on three separate occasions. Owens refused each time, apparently preferring to keep her job with Holiday. Nothing in the record supports a finding that Speedway tried to somehow force Owens to quit. To the contrary, Speedway honored her medical restrictions, reassured her that she could resume her position when she recovered, paid her workers' compensation benefits during the entire period of disability, and offered her shifts as soon as she was medically cleared to return to work.[4] As a result, Owens

---

[4] The fact that Owens's regional manager may have questioned the timing of her work restrictions is insufficient to establish that she suffered an adverse employment action. The regional manager's statement, while indelicate, did not result in any negative consequences. Owens was still provided full workers' compensation benefits and the opportunity to return to work. Further, the written warning issued because Owens knowingly used the broken chair after falling does not constitute an adverse action because it did not carry any negative consequences.

cannot establish that she suffered an adverse employment action.

## II.  WCA Claims

Owens contends that Speedway violated the WCA by retaliatorily discharging her and refusing to offer her continued employment.  Neither claim has merit.

### A.  Retaliatory Discharge

Minnesota prohibits "[a]ny person [from] discharging or threatening to discharge an employee for seeking workers' compensation benefits or in any manner intentionally obstructing an employee seeking workers' compensation benefits." Minn. Stat. § 176.82, subdiv. 1.  To establish a prima facie case of retaliatory discharge under the WCA, a plaintiff must show that (1) she engaged in statutorily protected activity, (2) she suffered an adverse employment action, and (3) there is a causal connection between the two events.  Ciszewski v. Eng'd Polymers Corp., 179 F. Supp. 2d 1072, 1092 (D. Minn. 2001).  The court will assume for purposes of this motion that Owens engaged in protected activity by filing a workers' compensation claim.  She has failed to establish, however, that she suffered an adverse employment action, let alone one that flowed from that protected activity.

As discussed above, Owens did not suffer any adverse employment action.  She nonsensically argues that Speedway

retaliated against her for accepting workers' compensation benefits by taking her off the work schedule during her period of disability.  But workers' compensation benefits are specifically designed to allow injured workers to recover with compensation, as well as the assurance that they are still employed and will be allowed to return to work when recovered.  That is exactly what happened here.  Speedway provided Owens full workers' compensation benefits – without complaint or challenge – so that Owens could recover from her injury.  When doctors cleared her to return to work, Speedway offered three separate times to put her back on the schedule.  Owens refused.  These facts make clear that Owens independently decided to terminate her employment with Speedway, and there is no persuasive evidence to the contrary.  Summary judgment therefore is warranted on this claim.

**B.   Refusal to Offer Continued Employment**

Minnesota Statutes § 176.82, subdiv. 2, precludes an employer from "refus[ing] to offer continued employment to its employee when employment is available within the employee's physical limitations."

Owens argues that Speedway violated this provision by offering her workers' compensation rather than reasonable accommodations

following her injury.  In essence, Owens seeks to raise the same claim under the WCA that she raised under the ADA.

As already discussed, the record does not support a finding that Speedway failed to reasonably accommodate Owens.  Further, this aspect of the WCA "applies where a plaintiff, because of a workplace injury, is unable to perform the essential functions of her job, and is terminated for that reason rather than being offered a position within her limitations." Doering v. Wal-Mart Stores, Inc., No. 12-cv-2629, 2014 WL 3395745, at *13 (D. Minn. July 11, 2014); see also Johnson v. J.B. Hunt Transp., Inc., No. 12-cv-2031, 2013 WL 6731935, at *6, *12 (D. Minn. Dec. 19, 2013) (holding that plaintiff stated a claim under § 176.82, subdiv. 2 where the employer "did not attempt to find [plaintiff] light duty work" and "never allowed [plaintiff] to return to work after his second injury and terminated him" where there was evidence that the employer had "created short-term light duty positions for injured employees" in the past); Poganski v. St. Cloud Hosp., No. 01-cv-20, 2002 WL 989481, at *6 (D. Minn. May 10, 2002) (denying defendant's motion for summary judgment where plaintiff returned to work in her position with modifications but reported that she was still suffering from severe pain and defendant terminated her

rather than offering her a different position).  That is not the situation here.

As set forth above, Speedway did not terminate Owens's employment.  Nor would she have needed any accommodation had she accepted one of Speedways' three offers for her to return to work.  Owens fully recovered from her injury and was not under any medical restrictions.  Under these circumstances, this claim under the WCA also fails.

## CONCLUSION

Accordingly, based on the above, **IT IS HEREBY ORDERED** that the motion for summary judgment [ECF No. 25] is granted. **LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: March 24, 2021

s/David S. Doty
David S. Doty, Judge
United States District Court
